UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:08CV-382-H

MADISON CAPITAL COMPANY, LLC                                    PLAINTIFF

V.

CONNIE SMITH
TIMOTHY P. SMITH
AMERICAN MINING & MANUFACTURING
CORPORATION                                                    DEFENDANTS


**AMENDED
MEMORANDUM OPINION**


Plaintiff, Madison Capital Company, LLC ("Madison") has filed this fraudulent

conveyance action in order to attach any assets of Defendant, Connie Smith ("Mrs. Smith") to

satisfy Madison's $1,200,000 judgment against Timothy Smith ("Mr. Smith") entered in the

Eastern District of Kentucky on August 26, 2008.

This case arises because in the midst of many financial transactions among the parties.

On or about June 1, 2006, Community Trust Bank ("CTB") reorganized and consolidated its

loans to the Smith Companies.  Mr. Smith personally guaranteed this loan.  Subsequently,

Madison purchased the loan and the related guarantee, taking an assignment of all CTB's rights

under the loan and personal guarantee.  After the Smith Companies could no longer pay,

Madison obtained a judgment against Mr. Smith personally in the Eastern District.  Mr. Smith

apparently has no assets to satisfy the judgment.  Madison's purpose in this current action is to

satisfy the judgment with cash or property which Mrs. Smith holds in her own name.

To accomplish this, Madison seeks judgment on the following grounds: (1) avoidance of

the June 2, 2006 transfer of $1,266,000 to Mrs. Smith as a "constructively" fraudulent transfer under KRS 378.020 (Count III); (2) avoidance of the $1,266,000 transfer to Mrs. Smith as an unrecorded inter-spousal conveyance pursuant to KRS 404.020 (Count IV); and (3) avoidance of the April 4, 2004, conveyance of Mr. Smith's interest in the Smiths' home *and* the $1,266,000 transfer as "actual" fraudulent transfers pursuant to KRS 378.010 (Counts I-II).  In each instance, Madison seeks a personal judgment against Mrs. Smith under the various fraudulent transfer theories.

This matter was tried before the Court on December 9, 2008, and the parties have filed post-trial briefs.  After issuing its Memorandum Opinion, the Court also discussed its contents and the scope of the appropriate relief.  This amended Memorandum Opinion is modified only slightly from the original.

I.

Some of the following findings of fact are relevant to the Court's inquiry, others are supplied merely for context.

The relevant events began around 2000 when Mr. Smith and other investors entered the coal mining business.  They formed a company called American Mining & Manufacturing Corporation ("AMMC").  Over the years AMMC borrowed funds from CTB to operate and expand the business.  In order to obtain financing he and his wife personally guaranteed many of the loans and offered their own personal property as collateral.  After a number of years CTB no longer required Mrs. Smith to personally guarantee the loans and eventually did not require that their marital residence be listed as collateral.

Madison Capital Company is a private equity firm that was interested in a coal mining

2

investment.  In mid-2005, Madison and Mr. Smith began talking about mutual ventures.

Madison made limited investments.  In June 2006, the Smith Companies, CTB and Madison

completely reorganized their relationships.  As the Court will describe, the reorganization

resulted in a consolidation of the Smith Companies, a reorganization of its debt and Madison

taking about a seventy-five (75%) percent ownership in the new entity.  From this arrangement

arose the financial collapse of the businesses, default of the debt and the personal judgment

against Mr. Smith which Madison now seeks to collect against his wife.

Now the Court goes back to the beginning of the story.  In 1999 Mr. and Mrs. Smith

bought their home on 1510 Kamer Drive, LaGrange, Kentucky 40031 (the "Marital Residence").

On December 11, 2000, Mrs. Smith personally guaranteed a $425,000 loan from CTB to Mr.

Smith's wholly-owned company, AMMC.   At that time, CTB required that Mr. and Mrs. Smith

pledge the Marital Residence as collateral for the loan.  In November 2001, CTB agreed to

release the Marital Residence as collateral for the loan, requiring only Mr. Smith's personal

guaranty of AMMC's debt.  Throughout this time AMMC was highly leveraged and always in a

tight cash position.  Mr. Smith wanted to avoid using his Marital Residence as collateral for

loans and to avoid having Mrs. Smith sign as a personal guarantor on the loans.  CTB knew this

and seemed agreeable to it.

On September 19, 2003, Mr. Smith executed a Quitclaim Deed to transfer his interest in

the Marital Residence to Mrs. Smith.  She did not provide any direct value in exchange for the

transfer.  Mr. Smith said that the purpose of the Quitclaim Deed was to avoid exposing the house

to any collection procedures that CTB might one day commence.  Because Mr. Smith filed the

Quitclaim Deed in the public record, CTB eventually knew of it.  The Marital Residence was

3

specifically excluded as collateral for subsequent business loans.  As one would expect of a married couple, Mr. Smith lived in the Marital Residence continuously after the transfer.  Mrs. Smith's income was insufficient to satisfy the obligations related to the Marital Residence.  The couple made the mortgage payments, property taxes, insurance, maintenance and utilities from the Smiths' jointly held bank account, with virtually all of those funds coming from Mr. Smith's income.

In February 2005, CTB provided various of Mr. Smith's wholly-owned companies with a $1,500,000 term loan and a $350,000 revolving loan (the "Bank Loans").  Mr. Smith executed personal, unconditional and absolute guarantees of the Bank Loans.  He used the proceeds of those loans to operate the Stone Chapel Mine.  Later that same year, American Mining West, LLC ("AMW")[1], borrowed $3,750,000 from Madison to purchase the Sunrise Mine.  Defendant AMMC guaranteed that loan.  Both the Sunrise and Stone Chapel Mines experienced severe cash flow problems.  In January 2006, Madison loaned AMW an additional $300,000 to cover expenses.  On February 13, 2006, Madison consolidated those loans with an additional $1,200,000 loan to the Smith Companies.  All of this is only necessary as background on the central events of this case.

By March, 2006, the Smith Companies had either defaulted or were about to default on their Bank Loans.  Mr. Smith faced a choice: secure additional funding to cover expenses or shut down the Sunrise Mine and liquidate.  As a consequence, Mr. Smith and Madison, the Smith Companies' largest creditor, entered into a series of transactions whereby Madison took an equity stake in a newly formed company called American Mining & Manufacturing, LLC

---

[1] AMW, AMMC, and USCC are referred to herein collectively as the "Smith Companies."

("AMM LLC") in exchange for a substantial write-down of the Smith Companies' bad debt and a million after-tax dollars for Mr. Smith.  As part of their agreement, Madison purchased certain mining equipment from Defendant AMMC for $1,266,000, which AMMC was contractually required to transfer to Mr. Smith.

On May 31, 2006, Madison and the Smith Companies entered into the Limited Liability Company Agreement to create AMM LLC.  For its 75% equity interest in AMM LLC, Madison contributed $4,000,000 in capital, which included $500,000 in cash, a $2,234,000 write-down of the Smith Companies' outstanding debts and the $1,266,000 in cash.  The Smith Companies contributed their remaining assets, valued at $1,333,333, for a 25% interest in AMM LLC.  Contemporaneously, Mr. Smith, on behalf of AMM LLC, signed a Promissory Note evidencing $2,870,167 of indebtedness to Madison after the write-off of $2,234,000.

Mr. Smith and the Smith Companies could not complete this reorganization without receiving the consent of CTB.  To obtain it, AMM LLC was added as an additional borrower on the Bank Loan, and Mr. Smith executed documents on June 1, 2006 that reaffirmed and restated his absolute and unconditional personal guarantee of the original bank loans.  Several months later, Madison purchased those bank loans from CTB, taking an assignment of all CTB's rights and interests in them.

All of these arrangements culminated on June 2, 2006, when Madison paid AMMC $1,604,787.65 for certain Smith Company assets.  The Contribution Agreement provides that "AMMC will distribute to Smith, its sole stockholder, the sales proceeds received by AMMC from Madison for the Madison Assets."  On the same date, pursuant to this agreement, Mr. Smith in turn apparently directed his business manager to wire transfer $1,266,000 to his wife's

PNC  money market account.  Mrs. Smith did not give her husband any direct consideration in exchange for that transfer.

After receiving the money, Mrs. Smith retired the mortgage on property held solely in her name and transferred the remaining funds to various other accounts.  Mrs. Smith transferred $200,000 to the Smiths' jointly held PNC account.  She paid off a Republic Bank mortgage in the amount of $113,132.06 on Mrs. Smith's individually-titled property located at 6601 Ashbrooke Drive, PeWee Valley, Kentucky.  Next, she transferred $600,000 to the PNC checking account that she held jointly with Mr. Smith.  On the same day, she wrote a $600,000 check to herself on the joint PNC account, then opened another account, held solely in her name, at Republic Bank & Trust Company.  In October 2006, Mrs. Smith withdrew another $188,296.07 from her individual PNC account, which she then deposited in a newly-opened investment account at PNC Investments.

When AMM LLC and the Smith Companies defaulted on the Bank Loans, Madison filed suit against Mr. Smith in the United States District Court for the Eastern District of Kentucky in its capacity as assignee of the CTB Credit Documents.  On March 13, 2008, that court found Mr. Smith absolutely and unconditionally liable under the Restated Guarantees and on August 26, 2008, it entered final judgment against Mr. Smith and in favor of Madison in the principal amount of $1,200,000.00.  To date, Madison has not satisfied its judgment against Mr. Smith.  Madison argues that because of the Marital Residence transfer and the Money Transfer, Mr. Smith has hindered Madison's ability to execute on assets in satisfaction of the judgment and has attempted to make himself virtually judgment-proof.

II.

Madison argues that it is entitled to judgment against Mrs. Smith pursuant to KRS

378.020 which states:

> Every gift, conveyance, assignment, transfer or charge made by a
> debtor, of or upon any of his estate without valuable consideration
> therefor, shall be void as to all his then existing creditors, but shall
> not, on that account alone, be void as to creditors whose claims are
> thereafter contracted, nor as to purchasers from the debtor with
> notice of the voluntary alienation of charge.

The purpose of this statute is to place the creditors back in the same position they enjoyed

immediately prior to any voidable conveyance. *Mattingly v. Gentry*, 419 S.W.2d 245 (Ky.

1967). To obtain relief under this statute, a creditor need not show fraudulent intent. *See Combs

v. Poulos*, 241 Ky. 617, 44 S.W.2d 571 (1931).

Madison argues that it is entitled to judgment because (1) Mr. Smith transferred

$1,266,000 to Mrs. Smith's account, (2) at a time when he was a debtor, (3) without valuable

consideration for the transfer, and (4) the creditor existed at the time of the transfer. There is no

apparent dispute that on June 2, 2006, Mr. Smith caused $1,266,000 in his possession to be

transferred to the personal account of his wife, Mrs. Smith. Mr. Smith received no consideration

for the transfer. Thus, Madison has clearly established the first and third required elements of a

prima facie case. The other two elements are disputed.

The facts also are undisputed that prior to June 2, 2006, AMMC was indebted to CTB.

Mr. Smith was entitled to receive the $1,266,000 payment through AMMC and CTB consented

to that payment. Madison and CTB understood and agreed that the $1,266,000 deposited in

AMMC's account for transfer to Mr. Smith. Mr. Smith was a guarantor for CTB's loan to

AMMC. The parties dispute the legal significance of this under KRS 378.020. At the time Mr.

7

Smith transferred his funds to his wife, he had no direct liability to CTB.  AMMC had not defaulted and CTB had no judgment against AMMC nor any direct claim against Mr. Smith. Certainly, Smith's status as a "debtor" would be much clearer had AMMC already defaulted and had CTB already obtained a judgment against it.  Thus, the more precise question is whether Mr. Smith's status as a guarantor, where liability is contingent upon a future default, makes Mr. Smith a debtor of CTB on June 2, 2006, for purposes of KRS 378.020?

The statute does not define a "debtor" and no recent Kentucky cases have provided any reasonable guidance.  Thus, the term as used in the statute is not a narrowly defined "term of art." In seeking the correct interpretation, Kentucky courts would begin with the basics and seek a reasonable and inclusive definition.  Black's Law Dictionary defines a "debtor" as "one who owes an obligation to another, esp. an obligation to pay money."  Mr. Smith has been labeled a "guarantor," which Black's defines as "one who makes a guaranty or gives security for a debt." The guarantor's actual liability for payment does not begin until the principal debtor is in default.  A contingent guaranty is a promise to pay a debt in the event of a specific occurrence, usually a default.

To be sure, the obligation of a debtor is different than that of a guarantor.  However, often a debtor's obligation is likewise contingent upon a variety of factors, such as certain financial conditions.  A debtor's actual liability to payment is usually governed by a note which may not require payment until some future date.  The entire amount of the debt may not be due for years or in the event of a default.  Thus, the fact that a guarantor's obligation to pay is contingent (or dependent upon other events) does not make him any less a debtor in the broad sense of the term.  These definitions demonstrate that a guarantor, while not the principal debtor,

8

is nevertheless a debtor as the term is commonly understood, one who owes an obligation of payment to another, albeit under specific conditions.

Several Kentucky cases address related circumstances. *Daniels v. Goff*, 192 Ky. 15, 20 (Ky. 1921) (finding that "existing liabilities" are broad enough to include "conditional or contingent obligations") and the recent Eastern District bankruptcy decision, *In re Salyers*, No. 06-10060, 2008 Bankr. LEXIS 1537, *5 (Bankr. E.D. Ky. May 20, 2008). These cases are not precedent for the Court's ruling. But their rulings are generally consistent with it.

The Court concludes that Kentucky courts would find that Mr. Smith, as a guarantor of AMMC's debt in these circumstances, is also a debtor as that term is used in KRS 378.020. Consequently, the $1,266,000 transfer from Mr. Smith to Mrs. Smith on June 2, 2006, is void. Madison argues that the only proper remedy under KRS 378.020 in these circumstances is a money judgment against Mrs. Smith in the amount of the fraudulent transfer. The Court cannot find authority to the contrary.

III.

Madison next argues that pursuant to KRS 378.010 both the martial residence transfer and the money transfer are voided. This statute provides:

> Every gift, conveyance, assignment or transfer of, or charge upon, any estate, real or personal, or right or thing in action, or any rent or profit thereof, made with the intent to delay, hinder or defraud creditors, purchasers or other persons, and every bond or other evidence of debt given, action commenced or judgment suffered, with like intent, shall be void as against such creditors, purchasers and other persons. This section shall not affect the title of a purchaser for a valuable consideration, unless it appears that he had notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor.

This statute provides that transfers made with the intent to delay, hinder or defraud creditors are

9

void.  This is an issue which the Court decides as a matter of law and fact.

Intent to defraud is presumed whenever at least one "badge of fraud" is present.  *See In re Triple S Restaurants, Inc.*, 422 F.3d 405, 414 (6th Cir. 2005); *Russell Cty. Feed Mill, Inc. v. Kimbler*, 520 S.W.2d 309, 312 (Ky. 1975).  When at least one badge of fraud is present, the burden shifts to the defendant, who must demonstrate by clear and convincing evidence that legitimate reasons motivated the transfer.  *Id.*  Despite the use of the term "fraud" in the phrase, "badges of fraud" are not separate incidents which must each contain all of the elements of common-law fraud in order to constitute a "badge."  Rather, the phrase "badges of fraud" describes a series of circumstances identified by case law which "so frequently attend" fraudulent transfers that, when one or more is present, the burden of proof shifts.  *Id.*

Plaintiff argues that because "badges of fraud" pervade the Quitclaim Deed, the burden of proof is upon Defendants to show the absence of fraud.[2]  Plaintiff cites (1) the recital of the false consideration, (2) the continued occupancy and payment of utilities and expenses, and (3) the distressed nature of the Smith Companies, as all badges of fraud pervading the Quitclaim Deed.  Even if the burden of proof is shifted to Defendants, the Court concludes that they have shown the absence of fraud as to this transaction.

Mr. Smith has said that his intention was to place his home outside the scope of his personal and company creditors.  To do this, he took a series of actions, all of which were open and nonfraudulent.  In 2001, Mr. Smith negotiated the release of his personal residence as collateral for his business loans.  Thereafter, CTB never sought to further encumber the property.

---

[2] The Court need not concern itself directly and extensively with the money transfer as those amounts are deemed recoverable under KRS 378.020.  However, the Court does not find badges of fraud associated with Mr. Smith's transfer of the funds to his wife.

Mr. Smith executed the Quitclaim Deed on September 19, 2003, and recorded it on July 24, 2004, all of which occurred prior to the financing of CTB's loan on February 4, 2005. Moreover, at the time the loan agreements were completed, Mr. Smith's counsel reminded CTB that the personal residence would be exempt from any enforcement action that CTB might take. The Court views the combination of all of these actions to be notice to CTB of Mr. Smith's actions and acknowledgment by CTB that the residence was not intended by either party as security for the loan.

From all this evidence, the Court concludes that Mr. Smith made no attempt to deceive CTB about the ownership of the residence and that, in fact, CTB knew or should have known of the transfer of the property. Consequently, CTB could not have been defrauded because they entered into the current loan agreements with full knowledge of Mr. Smith's actions.

IV.

Finally, Madison argues that it is entitled to void the money transfer under the interspousal transfer provisions of KRS 404.020. Defendants say that the statute is intended to protect those who extend credit in reliance upon the spouse's assets. Here, CTB did not extend credit to AMMC based upon Mr. Smith's ownership of the $1,266,000. That statute provides:

> "A gift, transfer or assignment of personal property between husband and wife shall not be valid as to third persons, unless it is in writing, and acknowledged and recorded as chattel mortgages are required to be acknowledged and recorded..."

Because the Court has already determined that the money transfer is void under KRS 378.020, it is unnecessary to discuss this issue.

The Court will enter an order consistent with this Memorandum Opinion.

11

cc:     Counsel of Record